IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TRADEPOINT ATLANTIC, LLC, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-21-1238 |
| ENVIRONMENTAL LIABILITY TRANSFER, INC., et al., | * | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Enviroanalytics Group, LLC's ("EAG") Motion to Dismiss Amended Complaint (the "EAG Motion") (ECF No. 44), Defendant Sparrows Point, LLC's ("SP") Partial Motion to Dismiss and to Strike Amended Complaint (the "SP Motion") (ECF No. 45), Defendant Industrial Demolition, LLC's ("ID") Motion to Dismiss Amended Complaint (the "ID Motion") (ECF No. 46), and Defendant Environment Liability Transfer, Inc.'s ("ELT") Motion to Dismiss Amended Complaint (the "ELT Motion") (ECF No. 48). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the ELT Motion, grant in part and deny in part the EAG Motion, and deny the SP Motion and the ID Motion.

## I.   BACKGROUND[1]

**A.   Factual Background**

### 1.   The Bethlehem Steel Property and the Parties' Obligations

This case concerns the 3,100-acre property that was once home to the Bethlehem Steel plant at Sparrows Point in Baltimore County, Maryland. (Am. Compl. ¶¶ 1, 32, ECF No. 39). The property has an onsite wastewater treatment plant that, under a Consent Decree in this Court, needs extensive environmental remediation work to meet federal and state regulatory requirements. (Id. ¶¶ 1, 9). In 2014, Plaintiff Tradepoint Atlantic, LLC ("Tradepoint") bought the property from SP and has invested hundreds of millions of dollars into redeveloping and restoring the property, particularly to complete needed environmental remediation. (Id.). In undertaking that work, Tradepoint contends that it has brought this suit to demand that EAG, SP's affiliate engaged to manage the project, honor its obligation to properly manage it, and to avoid SP, EAG, and ID from creating unnecessary and costly work. (Id. ¶ 3).

Tradepoint contends that its investment has been "obstructed" by SP, which contracted to perform environmental remediation work at the property, EAG, which reported to Tradepoint that "only the designed amount of work had been completed," and ID, which performed superfluous work and reaped benefits from it. (Id. ¶ 4). Further, SP has claimed that it will not complete the remediation work because it has become insolvent.

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint (ECF No. 39) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

(Id. ¶ 5).[2] Additionally, Tradepoint contends that SP has diverted funds to the other Defendants and otherwise escaped its contractual obligations. (Id.).

Before Tradepoint purchased the property, SP was obligated to undertake its environmental remediation under a Consent Decree in the United States District Court for the District of Maryland involving the United States Environmental Protection Agency ("EPA") and the Maryland Department of the Environment ("MDE").[3] (Id. ¶ 7). When Tradepoint bought the property, it did not assume SP's obligation to remediate it. (Id. ¶ 8). Rather, SP agreed to retain that obligation under the December 14, 2013 Purchase and Sale Agreement ("PSA") (ECF No. 39-1) and September 18, 2014 Environmental Remediation Trust Agreement ("ERTA") (ECF No. 39-2). (Id.; see also PSA § 5, ECF No. 39-1). Tradepoint paid $70,000,000 to provide a minimum pool of funds to meet SP's environmental obligations under the Consent Decree and fund other ancillary expenditures. (Am. Compl. ¶ 9).

Over the next few years, SP drew almost $49,000,000 from those funds to complete its environmental obligations. (Id. ¶ 11). Tradepoint contends that SP funneled around $18,000,000 to itself and to SP's affiliated entities, including ELT, EAG as a "consultant," and ID, which are under common ownership and control. (Id.). SP has nearly depleted all

---

[2] The Court notes that SP contends that allegations of its insolvency were borne from confidential settlement discussions that are not properly before the Court, as discussed infra.

[3] The Consent Decree was entered in United States v. Bethlehem Steel Corp., Nos. 1:97-cv-558-JFM (lead case) and 1:97-cv-559-JFM (consolidated case), ECF No. 6 (D.Md. Feb. 25, 1997); see also id. at ECF No. 113 (July 28, 2014 Modification of Consent Decree).

of the funds, and Tradepoint alleges that it "likely transferred the proceeds of the sale" to SP's affiliate entities, while still failing to complete the environmental work required under the PSA. (Id. ¶ 12). Thus, Tradepoint contends that SP has breached the terms of the PSA by both failing to complete the environmental work and by saddling Tradepoint with the remaining costs of undertaking it. (Id.). Further, Tradepoint alleges that SP's current claim of insolvency is part of a collective scheme to render SP judgment proof and evade its obligations. (Id. ¶ 13).

       2.      **SP's Obligations under the Consent Decree, PSA, and ERTA**

Before SP sold Tradepoint the property, ELT, the owner of SP, purchased it from a bankruptcy sale. (Id. ¶ 33). SP, a single-purpose entity created and owned by ELT, acquired the property in around September 2012. (Id.). In connection with that acquisition, SP agreed to be substituted as a party to the Consent Decree involving the former property owner, the EPA, and the MDE. (Id.). The Court ordered that SP "shall be subject to all terms and conditions of the Consent Decree, and shall comply with each and every one of the Consent Decree's provisions." (Id.). Additionally, the Consent Decree requires SP to perform environmental remediation work at the property under the EPA and MDE's oversight. (Id.).

In 2013, HRP Sparrows Point, LLC entered into the PSA with SP. (Id. ¶ 34). SP agreed to sell the property for $110,000,000. (Id.). In 2014, HRP Sparrows Point, LLC assigned its rights under the PSA to Tradepoint. (Id. ¶ 35). SP then transferred the proceeds of the purchase price to its affiliates and common owners, including ELT, instead of retaining that money to keep the business properly capitalized. (Id. ¶ 36). Tradepoint has

since entered into several administrative consent orders with the EPA and the MDE promising to complete certain environmental work. (Id. ¶ 37). Still, the parties agreed in the PSA that SP "shall ultimately be responsible for performing all actions necessary in relation" to the environmental remediation, including all work required under the Consent Decree, any administrative orders, and any other to-be-discovered environmental violations. (Id. ¶¶ 38–39; see PSA §§ 5, 15(b)). SP also agreed to indemnify Tradepoint from any and all costs that arise in connection with its environmental obligations. (Id. ¶ 41). SP further released Tradepoint from "any and all past, current, future and contingent [c]osts" related to these obligations. (Id.). Finally, SP agreed that Tradepoint has "the right to enforce the obligations of [SP] by any and all legal, equitable, and other means." (Id. ¶ 42; see PSA § 15(m)).

As mentioned above, under the terms of the PSA, Tradepoint agreed to deposit $70,000,000 into trust accounts to provide minimum designated funds to pay a portion of SP's environmental obligations under the ERTA and PSA. (Am. Compl. ¶ 43; see PSA § 2(c); ERTA § 2, ECF No. 39-2). Nonetheless, SP's obligations were neither contingent nor dependent upon the availability of those funds. (Id. ¶ 44).

ELT, by and through SP, contracted with an affiliate of common ownership, EAG, and other entities to perform work at the property. (Id. ¶ 45). These contractors included other SP affiliates, including ID. (Id.). In order to access the trust funds to pay for EAG's work, SP agreed to make Requisitions for Disbursement. (Id. ¶ 46). The Requisitions had to contain a certification from SP that all funds requisitioned were proper expenditures specifically authorized by the ERTA and PSA. (Id.; see ERTA § 4(a)). If Tradepoint

believed that the Requisitions were deficient, including if the work was performed in a defective manner, then the ERTA provided Tradepoint the opportunity to challenge the Requisition through a specified dispute resolution procedure. (Am. Compl. ¶ 46; see ERTA § 4(c)). Absent objection from Tradepoint, the trustee of the funds would then disburse payment to SP's designated entities working on the project. (Am. Compl. ¶ 46; see ERTA § 4(b)(c)).

SP began making Requisitions on a monthly basis in January 2015 and continued through November 2020, completing seventy total payment requests. (Am. Compl. ¶ 47). SP received around $49,000,000 in disbursements. (Id. ¶ 48). SP, through EAG, then remitted about half of those disbursements to independent third-party contractors, and the other half to EAG, which kept over $7,000,000 for itself, and ID, which received $11,000,000. (Id.). Tradepoint contends that by siphoning those proceeds to its affiliates, SP was left inadequately capitalized and ultimately insolvent. (Id. ¶ 49).

### 3.    EAG's Project Management and the Tin Mill Canal

EAG served as the project manager for the environmental remediation work in furtherance of SP's obligations under the PSA. (Id. ¶ 53). Specifically, EAG had to "perform in compliance with [the project management] those management services . . . as may be designated by [SP] which may include managing contractors, subcontractors, laborers, and suppliers performing Work and Service Obligations for or on behalf of [SP]; solicit[] quotes/bids for work associated with Work and Service Obligations; [and] over[see] and administ[er] Work and Service Obligations all the foregoing on behalf of [SP]." (Id. ¶ 54). EAG worked closely with Tradepoint in completing this work, including:

6

- Working side-by-side with Tradepoint in office space provided by Tradepoint;
- Attending weekly environmental meetings with Tradepoint and without the participation of SP;
- Communicating with Tradepoint on the day-to-day progress of the work;
- Conferring with Tradepoint regarding any issues; and
- Providing Tradepoint with reports on the progress of the work.

(Id. ¶ 56).

In 2017, EAG engaged with ID to complete dredging and site cleanup on an area of the property called the Tin Mill Canal as part of EAG's project management duties. (Id. ¶ 58). EAG and ID entered into a contract to complete that dredging work, valued at around $7,100,000, on the Tin Mill Canal (the "Tin Mill Cleanup Plan" or "Cleanup Plan"). (Id. ¶¶ 60–61). Ultimately, the total cost of that work was estimated at around $9,800,000. (Id. ¶ 60). EAG served as the project manager of the Tin Mill Cleanup Plan and oversaw particular dredging work. (Id. ¶ 62). Tradepoint contends that progress reports regarding that work falsely represented that the dredging of the Tin Mill Canal was done to a particular depth. (Id. ¶ 63). According to Tradepoint, November 2020 draft report indicated that the canal floor was dredged to an average depth of at least 24% greater than what the Tin Mill Cleanup Plan provided. (Id.). Thus, the excess excavation led to at least 19% additional dredged material and "resulted in nearly 28,592 tons of additional, unnecessary material being handled and disposed of at Tradepoint's on-site landfill." (Id.). Tradepoint alleges that SP, EAG, and ID failed to disclose that the canal was being over dredged. (Id. ¶ 64). Tradepoint contends that the unnecessary work led to overcharges of over $16,700,000, and further that the work was materially defective. (Id. ¶¶ 66–67).

Additional facts will be provided as needed below.

**B.**      **Procedural History**

On April 20, 2021, Tradepoint filed this lawsuit against ELT, SP, EAG, and ID in the Circuit Court for Baltimore County, Maryland. (ECF No. 2). On May 20, 2021, Defendants jointly removed the case to this Court. (ECF No. 1). On July 26, 2021, Defendants moved to dismiss the original Complaint. (ECF Nos. 24–27).

On September 24, 2021, Tradepoint amended its Complaint as of right (ECF No. 39), thereby mooting the then-pending motions.[4] In its Amended Complaint, Tradepoint alleges: breach of contract against SP (Count I); fraudulent conveyance by insolvency under Md. Code Ann., Com. Law ("CL") § 15-204 against all Defendants (Count II); conveyance made with intent to defraud under CL § 15-207 against all Defendants (Count III); fraudulent conveyance of partnership property under CL § 15-208 against all Defendants (Count IV); breach of contract against EAG and ID (Count V); professional negligence against EAG (Count VI); negligent misrepresentation against EAG (Count VII); intentional misrepresentation against EAG (Count VIII); and civil conspiracy against SP, EAG, and ID (Count IX). (Am. Compl. ¶¶ 82–188).

On October 28, 2021, EAG, SP, ID, and ELT moved to dismiss the Amended Complaint. (ECF Nos. 44–46, 48, respectively). On December 9, 2021, Tradepoint opposed the Motions. (ECF Nos. 51–54). On January 13, 2022, EAG, SP, ID, and ELT filed their Replies. (ECF Nos. 55–58, respectively).

---

[4] The Court issued an Order denying the initial Motions to Dismiss as moot on March 21, 2022. (ECF No. 59).

## II.   DISCUSSION

**A.   <u>Standard of Review</u>**

**1.   Rule 12(b)(2)**

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 396 (4th Cir. 2003) (citing <u>Mylan Labs., Inc. v. Akzo, N.V.</u>, 2 F.3d 56, 59–60 (4th Cir. 1993)). If the existence of jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989). If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits, and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." <u>Carefirst</u>, 334 F.3d at 396; <u>see also</u> <u>Mylan Labs.</u>, 2 F.3d at 60; <u>Combs</u>, 886 F.2d at 676. In determining whether the plaintiff has proven a prima facie case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." <u>Mylan Labs.</u>, 2 F.3d at 60; <u>Carefirst</u>, 334 F.3d at 396. As set forth above, in resolving motions brought under Federal Rule of Civil Procedure 12(b)(2), the court may consider evidence outside the pleadings. <u>Structural Pres. Sys., LLC v. Andrews</u>, 931 F.Supp.2d 667, 671 (D.Md. 2013).

Personal jurisdiction may be established through either of two avenues. If the defendant's contacts with the forum state form the basis for the suit, they may establish "specific jurisdiction." <u>Carefirst</u>, 334 F.3d at 397. In determining whether specific jurisdiction exists, a court must consider: (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." <u>Id.</u>; <u>see also</u> <u>ALS Scan, Inc. v. Digital Serv. Consultants, Inc.</u>, 293 F.3d 707, 711–12 (4th Cir. 2002); <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 n.8 (1984). If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state. <u>Int'l Shoe Co. v. State of Wash.</u>, 326 U.S. 310, 318 (1945). To establish general jurisdiction, the defendant's "affiliations with the State [must be] so continuous and systematic as to render it essentially at home in the forum State." <u>Daimler AG v. Bauman</u>, 571 U.S. 117, 139 (2014) (quoting <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011).

Absent a federal statute specifying different grounds for personal jurisdiction, federal courts may exercise jurisdiction in the manner provided by state law. Fed.R.Civ.P. 4(k)(1)(A). "[F]or a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." <u>Carefirst</u>, 334

F.3d at 396. With certain exceptions not at issue here, Maryland's long-arm statute

provides for personal jurisdiction over a nonresident defendant to the extent the defendant:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
> (5) Has an interest in, uses, or possesses real property in the State; or
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b). "[T]o the extent that a defendant's activities

are covered by the statutory language, the reach of the statute extends to the outermost

boundaries of the due process clause." Dring v. Sullivan, 423 F.Supp.2d 540, 545 (D.Md.

2006) (quoting Joseph M. Coleman & Assocs., Ltd. v. Colonial Metals, 887 F.Supp. 116,

118–19 n.2 (D.Md. 1995)).

**2.    Rule 12(f)**

Federal Rule of Civil Procedure 12(f) allows a district court, on motion of a part, to

"strike from a pleading an insufficient defense or any redundant, immaterial, impertinent,

or scandalous matter." A court may act "on its own" or "on motion made by a party either

before responding to the pleading or, if a response is not allowed, within 21 days after

being served with the pleading." Fed.R.Civ.P. 12(f)(1)–(2). "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (citation omitted). Thus, "[w]hen reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'" M.T. ex rel. Hayes v. Medley, No. 14-CV-0424, 2014 WL 1404527, at *1 (D.Md. Apr. 9, 2014) (alteration in original) (quoting Piontek v. Serv. Ctrs. Corp., No. PJM-10-1202, 2010 WL 4449419, at *8–9 (D.Md. Nov. 5, 2010)). Further, the Court will deny a Rule 12(f) motion "unless the matter under challenge has 'no possible relation to the controversy and may prejudice the other party.'" Id. (quoting U.S. ex rel. Ackley v. Int'l Bus Machines Corp., 110 F.Supp.2d 395, 406 (D.Md. 2000)). "[T]he disfavored character of Rule 12(f) is relaxed in the context of scandalous allegations, i.e., those that improperly cast a derogatory light on someone.'" Id. (quoting Asher & Simons, P.A. v. j2 Global Canada, Inc., 965 F.Supp.2d 701, 702 (D.Md. 2013)).

### 3.    Rule 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

<u>Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994); <u>Lambeth v. Bd. of Comm'rs of Davidson Cnty.</u>, 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).

### 4.    Rule 9(b)

Tradepoint's allegations of actual fraudulent intent in Count III and intentional misrepresentation in Count VIII implicate the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).[3] <u>Cozzarelli v. Inspire Pharm. Inc.</u>, 549 F.3d 618, 629 (4th Cir. 2008). The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). Under the rule, a plaintiff alleging

claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quoting Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011)).

As the Fourth Circuit has explained, Federal Rule of Civil Procedure 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F.Supp. 1055, 1056–57 (S.D.Ga. 1990)). By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. It states, in part: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Moreover, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the

particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

**B.    Analysis**

**1.    ELT's Jurisdictional Challenge**

The Court will first analyze ELT's challenges to the Court's personal jurisdiction "because the dismissal of a case on an issue relating to the dispute, such as a failure to state a claim, is improper without resolving threshold issues of jurisdiction, including personal jurisdiction." Hardwire, LLC v. Ebaugh, No. CV JKB-20-0304, 2021 WL 3809078, at *4 (D.Md. Aug. 26, 2021) (quoting Sucampo Pharms., Inc. v. Astellas Pharma, Inc., 471 F.3d 544, 548 (4th Cir. 2006)). ELT contends that this Court lacks both general and specific jurisdiction over this matter. The Court will address each in turn.

**a.    General Jurisdiction**

First, ELT contends that this Court lacks general jurisdiction over Tradepoint's claims against it. (ELT Mot. Dismiss Am. Compl. ["ELT Mot."] at 7–8, ECF No. 48-2). Tradepoint does not substantively respond to ELT's general jurisdiction arguments. At bottom, the Court finds that it lacks general jurisdiction over Tradepoint's claims against ELT.

"To establish general jurisdiction, the defendant's activities in the state must have been 'continuous and systematic.'" Tyler-Simms v. Vineyard Vines Retail, LLC, No. GJH-20-3081, 2021 WL 3080064, at *2 (D.Md. July 20, 2021) (quoting Carefirst, 334 F.3d at 397). "In the context of a corporation [or other business entity], the paradigm bases for general jurisdiction are 'the place of incorporation [or organization] and principal place of

business." Id. (quoting Barnett v. Surefire Med., Inc., No. JFM-17-1332, 2017 WL 4279497, at *2 (D.Md. Sept. 25, 2017)). "[W]hile those paradigms are not necessarily the only bases for general jurisdiction, it would be 'unacceptably grasping' to approve the exercise of general jurisdiction wherever a [defendant entity], 'engages in a substantial, continuous, and systemic course of business.'" Id. (quoting Barnett, 2017 WL 4279497, at *2). "[I]n-state business . . . does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity occurring in [the forum state.]" Id. (quoting BNSF Ry. Co. v. Tyrell, 137 S.Ct. 1549, 1558 (2017)). "[A] corporation is 'at home' only in its 'place of incorporation and its principal place of business' unless there is an 'exceptional case' that 'render[s] the corporation at home' elsewhere." Id. (quoting Richards v. NewRez LLC, No. ELH-20-1282, 2021 WL 1060286, at *15–16 (D.Md. Mar. 18, 2021)).

Here, ELT is incorporated in Missouri with a principal place of business in Town and Country, Missouri. Thus, ELT is at home in the state of Missouri, not in Maryland. Further, ELT's activities in the state of Maryland are not continuous and systematic. Although Tradepoint has argued that ELT has conducted business in Maryland through its ownership of SP, Tradepoint does not allege sufficient facts to present this matter as an "exceptional case" warranting a finding of general jurisdiction—specifically, whether ELT had direct, continuous, and systematic business in Maryland. See Tyler-Simms, 2021 WL 3080064, at *3. Additionally, as mentioned above, Tradepoint does not substantively respond to ELT's arguments regarding general jurisdiction. Accordingly, because ELT's contacts do not rise to the level of rendering it at home in Maryland, and because

Tradepoint has waived any argument, the requirements for the exercise of general jurisdiction are not met.

### b.    Specific Jurisdiction

Next, ELT contends that this Court lacks specific jurisdiction over Tradepoint's claims. (ELT Mot. at 12–15). At bottom, the Court finds that Tradepoint has not adequately alleged specific jurisdiction.

To assess specific jurisdiction, the Court applies a three-prong test: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" Tyler-Simms, 2021 WL 3080064, at *3 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)). Courts in this Circuit have considered several nonexclusive factors in assessing whether a business defendant has engaged in purposeful availment, including:

> (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; (8) whether the performance of contractual duties was to occur within the forum.

Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (citing cases).

Tradepoint has failed to make a prima facie showing that ELT has purposely availed itself of the privilege of conducting activities in Maryland. Tradepoint has not shown that ELT owns any Maryland offices, directly solicited business in Maryland, or sought any long-term business activities in the state. Indeed, the bulk of Tradepoint's allegations regarding the environmental remediation work relate to SP, EAG, and ID. Tradepoint's sole jurisdictional allegation regarding ELT is that it, in conjunction with EAG, "actively managed, oversaw, and made decisions with respect to the environmental remediation work." (Am. Compl. ¶ 28). But Tradepoint does not explain how ELT was involved in that oversight beyond through its ownership of SP, and Tradepoint does not include any allegations that specify ELT's role without tying it to another Defendant. (See id. ¶¶ 28 ("ELT and EAG actively managed . . . the environmental remediation work"), 45 ("ELT through SP[] specifically contracted with an affiliate with . . . EAG . . . to perform work . . . .")). And although ELT is registered to do business in Maryland, this alone is insufficient to establish specific jurisdiction absent other factors demonstrating that ELT purposely availed itself of the forum.

In its Opposition, Tradepoint contends that "ELT reached into Maryland in order to purchase the Property through its affiliate, SP[]." (Pl.'s Opp'n ELT Mot. Dismiss ["Opp'n ELT Mot."] at 6–7, ECF No. 54). Tradepoint attaches the affidavit of Michael J. Roberts, the co-owner of CDC and ELT, filed in another action in this Court. (Id. at 2). In his affidavit, Roberts states that CDC, an entity not otherwise described by Tradepoint, and

ELT "follow the common practice of forming a single purpose entity . . . to participate in the transaction, acquire title to the property, and assume liabilities." (Id. (citing Macsherry v. Sparrows Point, LLC, No. ELH-15-22, ECF No. 59-3, ¶ 5)). Tradepoint further points to ELT's website, which previously contained a post in which "ELT boasted about its success at the property at issue." (Id.). Tradepoint contends that Michael Roberts and his brother, Thomas E. Roberts, are "either members, organizers, directors, or officers of all four entities that worked at the property." (Id. at 3, 3 n.2).

Although Tradepoint does not use this language, it appears to argue that the actions of SP should be imputed to ELT, as it contends that ELT acted "through" SP to transact business in Maryland. Generally, of course, "the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." Glynn v. EDO Corp., 536 F.Supp.2d 595, 607 (D.Md. 2008). There is an exception, however, if the Court finds "circumstances warranting it to pierce the corporate veil." Newman v. Motorola, Inc., 125 F.Supp.2d 717, 722 (D.Md. 2000). "Maryland has adopted the so-called agency test in deciding whether to pierce the veil separating parent corporations from their subsidiaries for jurisdictional purposes." Id. (quoting Mylan Labs., 2 F.3d at 63) (cleaned up). Under the test, a court "may only attribute the subsidiary's actions to the parent 'if the parent exerts considerable control over the activities of the subsidiary.'" Id. (quoting Mylan Labs., 2 F.3d at 61). In order to determine whether to impute liability, the Court must assess "whether significant decisions of the subsidiary must be approved by the parent." Id. The Court may also examine "factors such as whether the parent and subsidiary keep separate books and records, use separate accounting procedures, and hold separate directors' meetings." Id.

"The court also looks to see if there is an independent reason for the existence of the company; that is, it must not be fraudulently incorporated or undercapitalized." <u>Id.</u>

As ELT correctly notes, Tradepoint does not make raise any factual allegations to support piercing the corporate veil here. (<u>See generally</u> Opp'n ELT Mot.). As such, Tradepoint has failed to establish that this Court has specific jurisdiction over ELT, and the Court will grant ELT's Motion to Dismiss and terminate ELT as a Defendant in this action.

**2.      SP's Motion to Strike Portions of Complaint**

Next, SP moves to strike portions of the Amended Complaint under Rule 12(f) that it contends are taken from inadmissible settlement communications under Federal Rule of Evidence 408. (Mem. Supp. SP's Partial Mot. Dismiss & Strike Am. Compl. ["SP Mot."] at 17, ECF No. 45-2). Rule 408 provides:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
> (b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

SP argues that Tradepoint's allegations of SP's insolvency rely on inadmissible admissions during the parties' settlement negotiations in June 2020. (SP Mot. at 17). Thus, SP requests that the Court strike portions of Paragraphs 5, 12, 13, 70, 71, and 79 referring to SP's admission of insolvency during the June 2020 settlement negotiations. Nonetheless, SP <u>does not</u> request that the Court strike Tradepoint's general allegations of SP's insolvency. (SP Mot. at 12). Tradepoint responds that SP's insolvency is highly relevant, that it could conceivably prove that SP was insolvent using admissible evidence at trial, and that it is premature to conduct an analysis of whether evidence of SP's insolvency will be admissible at trial. (Pl.'s Opp'n SP Mot. Dismiss & Mot. Strike ["Opp'n SP Mot."] at 8, ECF No. 52). At bottom, the Court finds that although it appears likely that such statements will be inadmissible under Rule 408, a more fulsome hearing on the alleged statements and any purported exceptions is warranted. Accordingly, the Court will deny the Motion to Strike without prejudice but will fully consider the matter before trial in response to a motion in limine or a renewed motion to strike regarding the statements.

In the Amended Complaint, Tradepoint includes the following allegations regarding SP's insolvency:

| Paragraph 5 | Rather than keep its commitments to Tradepoint, **SPLLC instead claims it will not complete the agreed-upon environmental remediation work because it has become insolvent and exhausted all of the funds Tradepoint provided to subsidize the remediation**. In fact, in an effort to escape its contractual obligations and render itself judgment proof, SPLLC has diverted funds to Defendants' coffers, who are related entities and affiliates, with several receiving sizeable and excessive payments from Tradepoint as the result. |
|---|---|
| Paragraph 12 | Now, having nearly depleted the Trust Funds, having likely transferred the proceeds of the sale to SPLLC-affiliated entities, and |

| | |
|---|---|
| | having not satisfied Seller's Environmental Obligations, **SPLLC seeks to evade its obligations by claiming that it is insolvent**. In so doing, SPLLC has breached the PSA by failing to satisfy Seller's Environmental Obligations and by saddling Tradepoint with the remaining cost of undertaking work to make the Property environmentally safe and which SPLLC agreed to be liable for under the PSA. |
| Paragraph 13 | Upon information and belief, **SPLLC's current claim of insolvency** is the result of Defendants' collective and purposeful scheme to render SPLLC judgment proof and evade its obligations and creditors. SPLLC knowingly failed to retain this money to generate a proper cash flow or capitalization that was necessary for SPLLC to continue its operations in a manner that would ensure it satisfied the various environmental remediation obligations. |
| Paragraph 70 | **In or about June 2020, SPLLC told Tradepoint that it had become insolvent**. |
| Paragraph 71 | **Tradepoint did not know or could not have reasonably known that SPLLC was on the verge of becoming insolvent or actually insolvent until SPLLC told this fact to Tradepoint in or about June 2020. In a subsequent communication, Tradepoint referred to SPLLC's insolvency.** SPLLC never disclaimed its statement that it was insolvent. |
| Paragraph 79 | In response to the SPLLC Cessation Letter **and SPLLC's representations that it was insolvent,** Tradepoint sent SPLLC a letter on September 4th, 2020 exercising Tradepoint's Immediate Step In Rights ("Tradepoint Step In Letter"), attached hereto as Exhibit 5 and incorporated herein by reference. |

(Opp'n SPLLC Mot. at 7–8, ECF No. 52 (emphasis added)).

The emphasized portions of these paragraphs, particularly those in Paragraphs 70 and 71, appear related to SP's statements during the June 2020 settlement negotiations. In Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 227 F.App'x 239 (4th Cir. 2007), the Fourth Circuit Court of Appeals affirmed a United States District Court for the District of West Virginia ruling striking portions of a complaint dealing with communications between the parties' attorneys made during settlement negotiations. Id. at 246. The Fourth Circuit noted that the District Court had held a hearing and discussed the

22

matter at length before determining that the plaintiff's proffered exceptions to Rule 408 were impermissible under the Rule and that the disputed information was not probative. Id. at 247. Recognizing this precedent, the Court finds that a more comprehensive review of the alleged admissions and Tradepoint's specific arguments regarding exceptions to the Rule is warranted. As such, the Court will deny the Motion to Strike without prejudice with the expectation that SP will file a motion in limine or a renewed motion to strike regarding the admissions before trial. The Court will then resolve whether the statements are admissible during the pre-trial conference.

The Court's decision should not be read as a ruling that it cannot resolve admissibility at this stage under Rule 12(f). Nonetheless, the Court is mindful that Rule 12(f) motions are to be granted infrequently, see Gilmore, 252 F.3d at 347, and that the Fourth Circuit has cited approvingly a District Court's thorough analysis of the evidentiary issues regarding settlement discussions under Rule 408 in a hearing, see Renaissance Greeting Cards, 227 F.App'x at 247. Thus, the Court will reserve judgment on the substantive issues in the Motion to Strike. Finally, given SP's averment that it does not oppose Tradepoint's general allegations regarding its insolvency, Tradepoint will be permitted to gather other evidence during discovery that it contends may be admissible at trial.

Accordingly, the Court will deny SP's Motion to Strike without prejudice with the understanding that it will address the admissibility of SP's admissions pre-trial in response to a motion in limine or renewed motion to strike.

23

3.      **Failure to State a Claim**

a.      **Fraudulent Conveyance (All Defendants)**

Tradepoint alleges various claims for fraudulent conveyance against all Defendants under Maryland law (Counts II–IV). "Both federal and Maryland state law require as elements of a fraudulent conveyance: (1) a transfer in interest; (2) by an insolvent or soon to be insolvent debtor; (3) for less than fair consideration or reasonably equivalent value." Kingsville Dodge, LLC v. Almy, No. CIV CCB-07-154, 2007 WL 2332699, at *2 (D.Md. July 30, 2007).

In Count II, Tradepoint alleges that Defendants violated CL § 15-204, which provides that "[e]very conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors <u>without regard to his actual intent</u>, if the conveyance is made or the obligation is incurred without a fair consideration." (Am. Compl. ¶¶ 91–98 (emphasis added)).

In Count III, Tradepoint alleges Defendants violated CL § 15-207, which states that "[e]very conveyance made and every obligation incurred <u>with actual intent</u>, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors." (Am. Compl. ¶¶ 99–104 (emphasis added)). In Maryland, actual fraudulent intent may be proven through nine recognized badges of fraud:

> [I]nsolvency or indebtedness of the transferor; lack of consideration for the conveyance; a relationship between the transferor and the transferee; the pendency or threat of litigation; secrecy/concealment; departure from the usual method of business; transfer of the debtor's entire estate;

24

reservation of benefit to the transferor; and the retention by the
debtor of actual possession of the property.

In re Rood, 459 B.R. 581, 601 (Bankr.D.Md. 2011), aff'd, 482 B.R. 132 (D.Md. 2012),

aff'd sub nom. S. Mgmt. Corp. Ret. Tr. v. Rood, 532 F.App'x 370 (4th Cir. 2013).

Finally, in Count IV, Tradepoint alleges Defendants violated CL § 15-208(b), which

states that:

> (b) Every conveyance of limited liability company property
> and every limited liability company obligation incurred when
> the limited liability company is or will be rendered insolvent
> by it, is fraudulent as to creditors of the limited liability
> company, if the conveyance is made or the obligation is
> incurred to:
>
> > (1) A member, whether with or without a promise by
> > him to pay the limited liability company's debts, unless
> > the conveyance or obligation represents fair and
> > reasonable compensation for services provided or to be
> > provided by the member to the limited liability
> > company and the services are provided or will be
> > provided within 120 days before or after the date the
> > conveyance is made or the obligation is incurred; or
> >
> > (2) A person not a member, without fair consideration
> > to the limited liability company as distinguished from
> > consideration to the individual members.

(See Am. Compl. ¶¶ 105–13).

The statutes regarding insolvency cite specific terminology that must be defined.

CL § 15-202 provides that "[a] person is insolvent if the present fair market value of his

assets is less than the amount required to pay his probable liability on his existing debts as

soon as they become absolute and matured." Fair consideration is given if:

> (1) In exchange for the property or obligation, as a fair
> equivalent for it and in good faith, property is conveyed or an
> antecedent debt is satisfied; or

> (2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

CL § 15-203(1)–(2).

SP argues, and EAG and ID join, that Tradepoint has made only vague and conclusory allegations as to SP's insolvency at the time of conveyance without pleading sufficient facts, which it contends is fatal to all three of its fraudulent conveyance claims. (SP Mot. at 12–13). Additionally, SP argues that Count III fails as Tradepoint's claim of actual fraudulent intent is not sufficiently pled under the heightened pleading requirements of Rule 9(b). (Id.). Tradepoint responds that SP is adding an element not central to the actual claims, namely that it must plead insolvency at the time of conveyance. (Opp'n SP Mot. at 3–4). Further, Tradepoint contends that information regarding SP's insolvency is uniquely within SP's knowledge, and thus SP's contention that Tradepoint needed to include factual allegations regarding SP's financial information and the nature of transactions occurring between the affiliate entities is unreasonable. (Id. at 4).

The Court declines to dismiss Tradepoint's claims at this early stage in the case. Tradepoint has alleged that SP dispersed the assets it obtained from the sale of the property from the trusts to its affiliated companies without adequate consideration. Moreover, as Tradepoint notes, information regarding the allegedly fraudulent conveyances is within the Defendants' knowledge as Defendants have access to the entities' financial information. Thus, the Court finds that dismissal before the parties are able to engage in discovery would be premature given the nature of the claims and will deny the SP Motion on those grounds.

The Court will consider any dispositive motions as to these claims after the parties are able to engage in discovery.

Accordingly, the Court will deny the SP Motion, EAG Motion, and ID Motion as to Counts II–IV.

### b.      Breach of Contract (EAG and ID)

Tradepoint asserts a claim for breach of contract as a third-party beneficiary against EAG and ID. (Count V). "To state a claim for breach of contract, the plaintiff must show that the defendant owed him a contractual obligation and that the defendant breached that obligation." All Weather, Inc. v. Optical Sci., Inc., 443 F.Supp.3d 656, 666 (D.Md. 2020). Moreover, "[t]he claim must 'allege with certainty and definiteness facts showing a contractual obligation.'" Kumar v. Mahone, No. GLR-21-735, 2022 WL 279798, at *7 (D.Md. Jan. 31, 2022) (alteration in original) (quoting Yarn v. Hamburger L. Firm, LLC, No. RDB-12-3096, 2014 WL 2964986, at *3 (D.Md. June 30, 2014)).

In Count V, Tradepoint alleges that EAG breached the Management Agreement and that ID breached the Joint Venture Agreement ("JV Agreement"). The Court will address each claim in turn.

### i.      Management Agreement

First, Tradepoint contends that EAG breached the Management Agreement it entered into with SP and brings a breach of contract claim as a third-party beneficiary to that agreement.[5] (Am. Compl. ¶¶ 114–29). "A federal court sitting in diversity must apply

---

[5] While Defendants have not waived argument regarding whether Tradepoint is a third-party beneficiary to the Management Agreement or JV Agreement, they do not

the choice-of-law rules from the forum state." <u>Chubb & Son v. C & C Complete Servs.,</u> <u>LLC</u>, 919 F.Supp.2d 666, 675 (D.Md. 2013) (quoting <u>Wells v. Liddy</u>, 186 F.3d 505, 521 (4th Cir. 1999)). In Maryland, it is "accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." <u>Id.</u> (quoting <u>Nat'l Glass, Inc. v. J.C. Penney Props., Inc.</u>, 650 A.2d 246, 248 (Md. 1994)). Thus, the Court need not inquire into the validity of a choice of law provision where "the parties agree that [the law of a particular state] law governs their claims." <u>Id.</u> (citation omitted). Here, EAG contends that the Management Agreement is governed by Missouri law, which Tradepoint neither waives nor disputes. (Mem. Supp. EAG's Mot. Dismiss Am. Compl. ["EAG Mot."] at 12 n.13, ECF No. 44-2; Opp'n EAG Mot. Dismiss ["Opp'n EAG Mot."] at 13 n.3, ECF No. 53). Accordingly, the Court will apply Missouri law to Tradepoint's breach of contract claim against EAG.

Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." <u>OS33 v. CenturyLink Commc'ns, LLC</u>, No. 4:17-CV-2603 CAS, 2018 WL 2267910, at *4 (E.D.Mo. May 17, 2018) (quoting <u>Keveney v. Mo. Military</u> <u>Acad.</u>, 304 S.W.3d 98, 104 (Md. 2010)).

Here, Tradepoint adequately alleges breach of the Management Agreement. First, Tradepoint alleges the existence of a contract between EAG and SP to perform work at the

---

meaningfully dispute it in their briefing. As such, the Court will presume that Tradepoint is a third-party beneficiary.

property in furtherance of completing SP's environmental obligations. (Am. Compl. ¶ 116). The Management Agreement provides that EAG contracted to perform "project management services . . . as may be designated by [SP] which may include managing contractors, subcontractors, laborers, and suppliers performing Work and Service obligations for or on behalf of [SP]; soliciting quotes/bids for work associated with Work and Service Obligations; [and] <u>oversight and administration of Work and Service Obligations all the foregoing on behalf of [SP].</u>" (Am. Compl. ¶ 54 (quoting Management Agreement § 1.01, ECF No. 44-5) (emphasis added)). Tradepoint contends that EAG breached the agreement by failing to ensure that the work performed at the Tin Mill Canal was consistent with the Cleanup Plan. According to Tradepoint, the Cleanup Plan does not contemplate over dredging:

> The Clean Up Plan states that "sediments [not contaminated with PCB] will be excavated to restore the flow capacity and expose the currently buried discharge ends of outfall pipes along the canal . . . ." (ECF No. 46-3, at 18.) A very small percentage of the canal was contaminated with PCB. Sediments contaminated with PCB should, per the Clean Up Plan, be excavated until the sampling reveals a PCB concentration of less than 50 mg/kg. (Id.) Based on these requirements, "a detailed inspection and survey" (ECF No. 46-3, at 11) was conducted. Based on this survey, the Clean Up Plan includes drawings of the site with cross-sections indicating the required depth of the dredging. (Id. at 35–36.)

(Opp'n EAG Mot. at 3–4). And Tradepoint alleges that it incurred damages as a result of that breach, namely the overcharge fees to the trust accounts and fees affiliated with overuse of its landfill. Thus, Tradepoint has adequately alleged a claim for breach of the

Management Agreement. Accordingly, the Court will deny EAG's Motion to Dismiss as to Count V.

ii.      JV Agreement

Next, Tradepoint alleges a claim for breach of contract against ID for breach of the JV Agreement. The JV Agreement is governed by Indiana law. In Indiana, "[t]o prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." IUE-CWA Loc. 901 v. Spark Energy, LLC, 440 F.Supp. 3d 969, 977 (N.D.Ind. 2020) (quoting Haegert v. Univ. of Evansville, 977 N.E.2d 924, 937 (Ind. 2012)).

Like EAG's arguments above, ID argues that the JV Agreement "does not obligate ID to excavate the Tin Mill Canal to the depths identified in the Cleanup Plan." (ID's Mot. Dismiss Am. Compl. ["ID Mot."] at 10, ECF No. 46-2). The Court disagrees. As ID admits, the JV Agreement references the Cleanup Plan in its Scope of Work section. (Id.). Further, the Scope of Work section provides that excavation would be completed to "desired depths." (Id.). Thus, the Court finds that the JV Agreement contemplates that ID would perform excavation in accordance with the Cleanup Plan, and therefore that Tradepoint has adequately alleged a breach of contract for the same reasons set forth above. Accordingly, the Court will deny ID's Motion to Dismiss as to Count V.

c.      Professional Negligence & Negligent Misrepresentation (EAG)

EAG argues that Tradepoint has failed to state a claim for professional negligence and negligent misrepresentation. (Counts VI–VII). "The elements required to establish a cause of action for professional negligence are equivalent to the elements required in a

standard negligence action; the professional, however, is held to the standard of care that prevails in his or her profession." Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP (Balfour Beatty I), 130 A.3d 1024, 1034 (Md.Ct.Spec.App. 2016), aff'd, 155 A.3d 445 (Md. 2017). "[O]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Id. (alteration in original) (quoting Restatement (Second) of Torts § 299A (1965)). In order to state a claim for negligence, the plaintiff must allege facts that support a finding of: "1) a duty to the plaintiff (or to a class of which the plaintiff is a part), 2) a breach of that duty, and 3) a causal relationship between the breach and the harm, and 4) damages suffered." Id. (citing cases).

Negligent misrepresentation, on the other hand, requires proof of the following elements:

> (1) The defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) The defendant intends that his statement will be acted upon by the plaintiff;
> (3) The defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) The plaintiff, justifiably, takes action in reliance on the statement; and
> (5) The plaintiff suffers damage proximately caused by the defendant's negligence.

Id. at 1046. Finally, in order to recover damages for fraudulent representation:

> [A] plaintiff must prove that a false representation was made, that its falsity was either known to the maker or that the representation was made with such reckless indifference to the

truth as to be equivalent to actual knowledge of falsity, that the representation was made for the purpose of defrauding the plaintiff, that the plaintiff not only relied on the representation but had a right to rely on it and would not have done the thing from which the injury arose had the misrepresentation not been made, and that the plaintiff actually suffered damage directly resulting from the misrepresentation.

Id. (quoting Swinson v. Lords Landing Vill. Condo., 758 A.2d 1008, 1016 (Md. 2000)).

EAG argues that the economic loss doctrine bars Tradepoint's negligence claims because Tradepoint's damages are strictly economic. (EAG Mot. at 15). Tradepoint responds that the doctrine does not bar its claims because it is able to show that an "intimate nexus" exists to impose a duty on EAG. Although this dispute presents a novel question before the Court, the Court agrees that the economic loss doctrine bars Tradepoint's claims.

The economic loss doctrine provides that "a party cannot recover against another in tort where the resulting harm is purely economic loss and the parties have no contract between them." Balfour Beatty I, 130 A.3d at 1035. Where the economic loss doctrine applies, a plaintiff must show privity or its equivalent, called an "intimate nexus," to impose a duty of care sufficient to support a negligence claim. Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP (Balfour Beatty II), 155 A.3d 445, 453 (Md. 2017). In such cases, if an intimate nexus is shown, a duty of care is owed and a defendant can be held liable for negligence. Id.

Here, Tradepoint's alleged harm is purely economic. Therefore, in order to impose liability on EAG under negligence theories, it must show that an intimate nexus applies, thereby establishing a duty of care. Fatal to Tradepoint's arguments, however, is that the

Court of Appeals of Maryland has already determined that the economic loss doctrine bars negligence claims in a similar complex construction case.

In Balfour Beatty II, the Court of Appeals conducted a thorough review of the economic loss doctrine and the intimate nexus standard in the context of a public construction project. See generally id. The court acknowledged that "[j]urisdictions are split over whether to apply the economic loss doctrine in the construction context." Id. at 457. The court explained:

> States applying the economic loss doctrine to bar recovery typically reason that the construction industry is governed by a network of often-complicated contracts, and because the parties have carefully contracted to protect against economic losses, there is no reason to add a tort remedy to the mix for use by parties claiming such losses.

Id. at 458. After conducting a comprehensive review of the jurisdictional split and an assessment of the policy rationales regarding the allocation of risk in such cases, the court "decline[d] to extend the privity-equivalent intimate nexus test to design professionals on government construction projects." Id. at 461.

Tradepoint argues that Balfour Beatty II does not foreclose its claims here because it is limited to government construction contracts, not the private construction contracts relevant here. (Opp'n EAG Mot. at 22). While Tradepoint is correct that the court did not definitively hold that the intimate nexus test can never apply in other contexts, see Balfour Beatty II, 155 A.2d at 461, this Court finds that the reasoning supporting the Court of Appeals' application of the economic loss doctrine extends to a case such as this one. There, the court found that "the complex web of contracts that typically undergirds a public

construction project should govern because parties have sufficient opportunity to protect themselves (and anticipate their liability) in negotiating these contracts." Id. at 460. The same is true here. It is beyond dispute that this private construction project involves a complex web of contracts between the parties—indeed, those contracts are the subject of several claims in this suit. It follows, then, that in negotiating these contracts, the parties were able to "to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they [were] not satisfied with it." Id. at 460–61 (quoting BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 72 (Colo. 2004)). Thus, "there is no reason to add a tort remedy to the mix" here. See id. at 458.

As the circumstances at bar overlap significantly with those before the Court of Appeals in Balfour Beatty II, the Court finds that under Maryland law, the economic loss doctrine bars Tradepoint's claims for professional negligence and negligent misrepresentation. Accordingly, the Court will dismiss Counts VI and VII against EAG.

### d.   Intentional Misrepresentation (EAG)

EAG argues that Tradepoint has failed to state a claim for intentional misrepresentation under Maryland law. (Count VIII).[6] The elements of intentional misrepresentation are:

> (1) the defendant made a false representation to the plaintiff;
> (2) the falsity was either known to the defendant or the representation was made with reckless indifference as to its truth; (3) the misrepresentation was made for the purpose of

---

[6] The Court notes that EAG does not argue that the economic loss doctrine bars Tradepoint's claim for intentional misrepresentation. (See EAG Mot. at 18–22). Thus, the Court does not reach the question of whether the doctrine bars such a claim, which was not addressed by the Court of Appeals in Balfour Beatty II. See generally 155 A.3d 445.

> defrauding plaintiff; (4) the plaintiff relied on the
> misrepresentation and the right to rely on it; and (5) the
> plaintiff suffered compensable injury resulting from the
> misrepresentation.

Jenkins v. PBG, Inc., 268 F.Supp.2d 593, 597 (D.Md. 2003). Because Tradepoint's

intentional misrepresentation claim sounds in fraud, the heightened pleading requirements

of 9(b) apply.

Tradepoint alleges that EAG falsely represented its work in a number of written

progress reports indicating that the Tin Mill Canal was dredged to the estimated depths in

the Cleanup Plan. (Am. Compl. ¶ 165). Tradepoint summarizes its allegations as follows:

- The scope and parameters of the Tin Mill Canal Dredging, including the depth to which the canal was to be dredged, were detailed and provided in the Tin Mill Canal Maintenance Clean Up Plan (Revision 3), 12/18/17, that was prepared by EAG and its agent on behalf of SPLLC and Tradepoint in furtherance of the Seller's Environmental Obligations and was submitted to and approved by the MDE and EPA pursuant to the Amended Consent Order that governed the Seller's Environmental Obligations. (Am. Compl. ¶ 61.)
- EAG contracted with Industrial Demolition to perform the Tin Mill Dredging work under a time and materials compensation model, which meant that the more work Industrial Demolition performed or materials Industrial Demolition used, the more time and materials it would take, and the more it would get paid, subject to EAG's approval and management. (Am. Compl. ¶ 60.)
- On numerous specific occasions, EAG represented to Tradepoint in periodic progress reports that the Tin Mill Canal Dredging, including the dredging depth of each section of the canal and therefore the amount of material required to be moved from the canal and then later dried and transported, was progressing in accordance with the approved Maintenance Clean Up Plan for the Tin Mill Canal (Revision 3). (Am. Compl. ¶ 64.)

- Tradepoint explains specifically how EAG's representations were false. (See id. ¶ 64.) EAG did not (and does not now) claim that the additional work was necessary for any reason.
- EAG's representations were made with the intent to prevent Tradepoint from objecting to the Requisitions for Disbursements for the additional and unnecessary work, "which was materially and substantially defective given that it was unnecessary to perform in order to complete the approved" Clean Up Plan, as allowed under the ERTA. (Am. Compl. ¶¶ 67–68.)

(Opp'n EAG Mot. at 24–25). The purportedly false representations are outlined in depth in the Amended Complaint. (See Am. Compl. ¶ 64). For example, Tradepoint alleges:

- Progress Report #1, dated April 18, 2018, falsely represented that "[t]he canal was excavated to designated elevations to ensure positive flow as indicated on Sheet 2 [a drawing illustrating the existing and Maintenance Cleanup Design Bottom elevations for Section #1]" and that "[t]here were no notable occurrences or exceptions to the [Clean Up Plan] during the cleanup of Section #1" of the canal. Yet, the "as-built" analysis of the canal depths at the end of the project showed that the dredged depth of Section #1 was in fact much greater . . . .
- Progress Report #2, dated June 28, 2018, falsely represented that "[t]he canal was excavated to the elevations indicated on Sheet 2" . . . . Yet, the "as-built" analysis of the depth of the canal at the end of the project showed that in fact the dredged depth of Section #2 was 1.85 feet greater . . . .
- Progress Report #3, dated July 23, 2018, falsely represented that "[t]he canal was excavated to the elevations indicated on Sheet 2" . . . . Yet, the "as-built" analysis of the depth of the canal at the end of the project showed that in fact the dredged depth of Section #3 was 2.64 feet greater . . . .
- Progress Report #4, dated October 18, 2018, falsely represented that "[t]he canal was excavated to the elevations indicated on Sheet 2" . . . . Yet, the "as-built"

> analysis of the depth of the canal at the end of the project
> showed that in fact the dredged depth of Section #4 was
> 0.64 feet greater . . . .

(Id.).

EAG first argues that Tradepoint's intentional misrepresentation claim fails because it has not plausibly alleged that EAG's purported misrepresentations were material. (EAG Mot. at 19). In Maryland:

> A "false representation" is a statement, conduct, or action that intentionally misrepresents a material fact. Parker v. Columbia Bank, 91 Md.App. 346, 359, 604 A.2d 521, cert. denied, 327 Md. 524, 610 A.2d 796 (1992); Snyder v. Herbert Greenbaum & Associates, 38 Md.App. 144, 148, 380 A.2d 618 (1977). A "material" fact is one on which a reasonable person would rely in making a decision. See MPJI § 11:4, at 320.

Sass v. Andrew, 832 A.2d 247, 260 (Md.Ct.Spec.App. 2003). The statement cannot be an "estimate" or "opinion." Parker v. Columbia Bank, 604 A.2d 521, 528 (Md.Ct.Spec.App. 1992). EAG contends that Tradepoint's claims fail because it has not specifically alleged that a reasonable person would rely on the representations in the progress reports. The Court disagrees. EAG has not cited any caselaw in support of its proposition, and the Court declines to toss out Tradepoint's claim due to its failure to reference the reasonable person standard in its otherwise comprehensive pleading.

Next, EAG argues that the Court should dismiss the claim because Tradepoint has failed to plead that it actually relied on EAG's misrepresentations. As EAG notes, the reliance element is typically "reserved for the finder of fact." 200 N. Gilmor, LLC v. Capital One Ass'n, 863 F.Supp.2d 480, 491 (D.Md. 2012). Accordingly, the Court declines to determine the plausibility of Tradepoint's purported reliance at the pleading stage. The

37

Court will therefore deny EAG's Motion as to Tradepoint's intentional misrepresentation claim.

### e.      Civil Conspiracy (EAG, ID, SP)

Finally, Tradepoint asserts a claim for civil conspiracy against EAG, ID, and SP. (Count IX). A civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." Ark. Nursing Home Acquisition, LLC v. CFG Cmty. Bank, 460 F.Supp.3d 621, 647 (D.Md. 2020) (quoting BEP, Inc. v. Atkinson, 174 F.Supp.2d 400, 408 (D.Md. 2001)). There is no distinct tort for civil conspiracy under Maryland law; rather, "a civil conspiracy theory merely serves to extend liability to the co-conspirators after some other tortious conduct is established." Id. (citing McDaniel v. Maryland, No. RDB-10-189, 2010 WL 3260007, at *11 (D.Md. Aug. 18, 2010)). Thus, in order to succeed on a claim for civil conspiracy, "the plaintiff must allege other tortious conduct." Rojas v. Huntington Neighborhood Ass'n, No. DLB-21-28, 2022 WL 616815, at *4 (D.Md. Mar. 1, 2022). Pleading civil conspiracy in a separate count "as if it were a 'cause[] of action independent of an underlying tort'" is improper. Ark. Nursing Home, 460 F.Supp.3d at 647 (alteration in original) (quoting Manikhi v. Mass Transit Admin., 758 A.2d 95, 110 n.6 (Md. 2000)).

Defendants argue that the Court should dismiss Tradepoint's civil conspiracy claim for want of an underlying tort because all of Tradepoint's tort claims fail to state a claim upon which relief may be granted. (See, e.g., SP Mot. at 16–17). As explained more fully

above, the Court has not dismissed all of Tradepoint's alleged tort claims—indeed, Tradepoint's intentional misrepresentation claim has survived. Thus, Tradepoint has an underlying claim upon which civil conspiracy could attach.

Finally, Defendants argue that Tradepoint's civil conspiracy claim fails because the allegations in the Amended Complaint are conclusory. (See, e.g., EAG Mot. at 24). Again, the Court disagrees. In the Amended Complaint, Tradepoint includes the following allegations in support of its civil conspiracy claim against Defendants:

- SPLLC, EAG, and Industrial Demolition entered into an agreement to defraud Tradepoint by overworking the Tin Mill Canal Dredging far in excess of the design plan, and reporting to Tradepoint the opposite, all for their own financial gain.
- In furtherance of the conspiracy to defraud Tradepoint, Industrial Demolition performed unjustifiable and superfluous work relating to the Tin Mill Canal Dredging and Seller's Environmental Obligations, including dredging the Tin Mill Canal to an average depth of at least 24% deeper than the Clean Up Plan and the reported depths, causing a commensurate increase in Costs
- Industrial Demolition also submitted invoices for the unjustifiable and superfluous work performed relating to the Tin Mill Canal Dredging and Seller's Environmental Obligations to EAG. EAG in turn made Disbursement requests to SPLLC using Industrial Demolition's invoices, who made Requisitions for Disbursements from the Trust Fund for Industrial Demolition's invoices. SPLLC ultimately paid over $11 million in Disbursements from the Trust Fund to Industrial Demolition, an affiliate of SPLLC, well in excess of the budgeted $7.1 million amount.
- SPLLC and/or EAG made Requisitions for Disbursements and received Disbursements from the Trust Funds totaling $16.7 million, which includes not only the contemplated and estimated costs of approximately $9.8 million, but also the overage

> charges in the amount of approximately $6.9 million.
> The unnecessary removal, handling, treatment, and
> disposal of the Excess Material made up at least $2.5
> million of the $6.9 million cost overrun.

(Am. Compl. ¶¶ 175–88). Here, Tradepoint has alleged sufficient facts from which one could infer the existence of a conspiratorial agreement. Thus, the Court will deny Defendants' respective Motions to Dismiss Count IX.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendant Environment Liability Transfer, Inc.'s Motion to Dismiss Amended Complaint (ECF No. 48), grant in part and deny in part Defendant Enviroanalytics Group, LLC's Motion to Dismiss Amended Complaint (ECF No. 44), and deny Defendant Sparrows Point, LLC's Partial Motion to Dismiss and to Strike Amended Complaint (ECF No. 45) and Defendant Industrial Demolition, LLC's Motion to Dismiss Amended Complaint (ECF No. 46). A separate Order follows.

Entered this 29th day of September, 2022.


_____/s/_____
George L. Russell, III
United States District Judge